IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 09-cv-00369-WDM-BNB

KARENE'E WILLIAMS,

Plaintiff,

v.

M&T BANK, as successor by merger to M&T Mortgage Corporation,

Defendant.
_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

This matter arises on the plaintiff's **Motion to Rescind Settlement Agreement** [Doc. # 86, filed 6/24/2010] (the "Motion to Rescind"). I held a hearing on the Motion to Rescind on September 20, 2010, received evidence, and heard the arguments of counsel.

I respectfully RECOMMEND that the Motion to Rescind [Doc. # 86] be DENIED.

This case arises out of a failed mortgage loan. The plaintiff borrowed $236,000 from defendant, M&T Bank ("M&T"), "secured by a mortgage on her residence. . . ." Scheduling Order [Doc. # 63] at pp. 2-3. The plaintiff defaulted on the loan by failing to make payments when due; "M&T foreclosed on the property" in February 2009; and M&T subsequently brought eviction proceedings against the plaintiff. Id. The plaintiff commenced this action by filing a Verified Complaint [Doc. # 1, filed 2/23/2009] alleging violations of the Real Estate Settlement Procedures Act, 27 U.S.C. §2601 et seq. ("RESPA"), and the Colorado Consumer Protection Act, section 6-1-101 et seq., C.R.S. ("CCPA"). The plaintiff summarized the factual bases for her claim as follows:

> [T]he information Plaintiff supplied to her broker in her [loan]
> application was not the same information upon which Defendant
> based its loan to her. Plaintiff did not qualify for the mortgage
> loan that Defendant gave to her and could not afford to make the
> payments. Defendant promised to reduce the interest rate so that
> Plaintiff could make payments, but Defendant did not reduce the
> interest rate or restructure the mortgage loan.

Scheduling Order [Doc. # 63] at p. 2.

I held a settlement conference on March 29, 2010. At the conclusion of the settlement conference, it appeared that the parties had reached an agreement, which was placed on the record. The transcript of proceedings on March 29, 2010 [Doc. # 107-4] (the "First Transcript"), includes the following exchange:

> THE COURT: This is Case 09-cv-369, Williams versus M&T
> Bank. We've been engaged in a settlement conference and a
> settlement of the case has been reached. What I would like to do
> now is to have each lawyer enter his or her appearance and
> introduce your client or client representative. Once that's
> occurred, I will state the terms of the settlement as I understand
> them to be. Once I've done that, then I will give each lawyer an
> opportunity to make any additions, corrections, or modifications to
> the terms as may be necessary, and once we have an accurate
> statement of the terms on the record, I'll ask each client or
> representative to state that they've heard the terms, understand the
> terms, and that the terms are acceptable to them.
>
> [Appearances and introductions are made.]
>
>                 \*     \*     \*
>
> THE COURT: Thank you.
>
> The terms of the settlement as I understand them are as follows:
> The case will be settled by Ms. Williams purchasing and M&T
> selling the property within 90 days of today. The funding for the
> purchase of the property will be obtained by Ms. Williams from a
> third-party lender. In the event the case--the purchase and sale
> doesn't close within 75 days of today, then beginning on the 76th
> day Ms. Williams will be obligated to pay rent in the amount of
> $60 per day from the 76th day until M&T obtains possession of the

property by Ms. Williams vacating it or by foreclosure. I'm sorry, by eviction.

MR. JANISZEWSKI [Plaintiff's counsel]: Excuse me, Your Honor, or by the deal closing, because it could close and--

THE COURT: Or by the deal closing.

\* \* \*

The purchase price for the property will be determined by an appraisal to be performed by an independent appraiser who is qualified or certified by Freddie Mac and Fannie Mae and the appraiser will be affiliated with an AMC, and the AMC is to be selected by plaintiff and her counsel.

The purchase and sale will be subject to the standard terms of the real estate buy-sell agreement with the following modifications: The property will be purchased in its as is condition, there will be no mediation provision applicable to this transaction, and the buy-sell agreement will be subject to the terms of the settlement agreement which will be executed in connection with the settlement of this case.

In the event there is no closing within 90 days, then the plaintiff is obligated to deliver the property to M&T in its condition as it exists now, and to establish that condition there will be an inspection of the property within seven days of today.

In the event the plaintiff does not vacate the property--in the event there is no sale and the plaintiff does not vacate the property within 90 days, then M&T may cause her to be evicted.

The settlement agreement, in addition to the terms I just went over, will provide for a release of claims and counterclaims as between the parties, each party to pay its own costs and attorneys' fees, and the settlement agreement will be executed and this case will be dismissed within 14 days of today.

Mr. Janiszewski, any additions, corrections, or modifications?

MR. JANISZEWSKI: No, Your Honor.

THE COURT: Ms. Kitaev, any additions, corrections, or modifications?

MS. KITAEV: One minor clarification and that is that Ms. Williams has agreed not to contest the eviction after the 90-day point.

THE COURT: Mr. Janiszewski?

MR. JANISZEWSKI: I don't know what--

MS. WILLIAMS: I won't contest the eviction if--only if say I found somebody that's going to be the lender on it and we haven't closed by then, that's the only way I won't contest. Is that okay?

MS. KITAEV: I think that's acceptable, Your Honor.

THE COURT: All right. Thank you.

Ms. Williams, have you heard the terms of the settlement?

MS. WILLIAMS: Yeah, I heard it.

THE COURT: Do you understand them?

MS. WILLIAMS: Yes.

THE COURT: Are they acceptable to you?

MS. WILLIAMS: I don't have a choice.

THE COURT: I'll have to have you answer yes or no. Are they acceptable to you?

MS. WILLIAMS: Yes.

THE COURT: Thank you.

MS. WILLIAMS: Can I go now?

THE COURT: Almost.

Ms. Rogers, have you heard the terms?

>           MS. ROGERS: Yes, I have.
>
>           THE COURT: Do you understand them?
>
>           MS. ROGERS: Yes, I do.
>
>           THE COURT: Are they acceptable to you?
>
>           MS. ROGERS: Yes, they are.
>
>           THE COURT: And do you have authority this afternoon to speak on behalf of M&T Bank in connection with this matter?
>
>           MS. ROGERS: Yes, I do.
>
>           THE COURT: Thank you all very much.

First Transcript [Doc. # 107-4] at p. 2 line 5 through p. 6 line14.

A problem developed concerning the appraisal obtained to set the purchase price, requiring a second settlement conference on April 22, 2010. At the conclusion of the second settlement conference, a modification to the earlier agreement was placed on the record. The transcript of proceedings on April 22, 2010 [Doc. # 107-4] (the "Second Transcript"), includes the following relevant matters:

>           MR. JANISZEWSKI: Okay. As you said, the settlement that we reached March 29th is--remains the same except for these amendments: That there will be a new appraisal arranged for by me through an AMC [appraisal management company]. M&T will reimburse my law firm for paying for that. . . . Fifteen days are added to the closing date mentioned in the original settlement agreement, that brings us to the closing date now being July 12th, 2010, the latest possible date for closing, we can close anytime before then.

Second Transcript [Doc. # 107-4] at p. 3 lines 2-15. Ms. Williams expressed her understanding of and agreement to the modification. Id. at p.6 lines 6-12.

The second appraisal apparently was completed, resulting in a purchase price of

$200,000. Transcript of Proceedings on September 20, 2010 [Doc. # 108, filed 10/1/2010] (the "Hearing Transcript") at p. 10 lines 19-21. Thereafter, the plaintiff filed the Motion to Rescind asserting a mutual mistake of fact, as follows:

> M&T and Williams entered the settlement agreement under the mistake that it would be difficult but possible for Williams to obtain financing. Williams has a guarantor lined up and, mistakenly, thought that having a guarantor would enable her to obtain financing and perform under the settlement agreement. However, the fact at the time M&T and Williams entered the settlement agreement was that existing Fannie Mae guidelines prohibit lending to any person who has been through a foreclosure for five years after said foreclosure. The fact at the time these parties entered the settlement agreement was that it would be impossible for Williams to obtain financing, even with a dozen guarantors.

Motion to Rescind [Doc. # 86] at ¶3.

The plaintiff has offered, in support of her position that it is not possible for her to obtain a loan to perform the settlement terms, a document captioned Fannie Mae Announcement 08-16 dated June 25, 2008 [Doc. # 107-2] ("Ann. 08-16"). The Announcement states in relevant part:

> With this Announcement 08-16, Fannie Mae is updating the requirements regarding the time period that must elapse before borrowers can demonstrate they have reestablished their credit history after the occurrence of a bankruptcy or foreclosure.
> \* \* \*

| Action | Current Requirements | New Requirements |
| --- | --- | --- |
| Foreclosure | 4-year time period from the date the foreclosure sale was completed ("completion date") | 5-year time period from completion date |

Ann. 08-16 [Doc. # 107-2] at pp. 1-3.

The Motion to Rescind is also supported by the plaintiff's affidavit which establishes that she applied for a mortgage loan from "Amerisave, Lending Tree, National Bank NFB, Horizon (who is in process of a name change), and Cherry Creek Mortgage." Affidavit of Karene'e Williams [Doc. # 86-2] (the "Williams Aff.") at ¶2. According to the plaintiff:

> I have been denied by all of these lenders because of a Fannie Mae guideline that prohibits lenders from lending to people who have a foreclosure on their credit report for five years after the foreclosure. I have been told by every lender that my having a guarantor does not qualify me for a mortgage, because I have a foreclosure on my record, M&T's foreclosure.

Id. at ¶3.

The defendant counters that there was no mutual mistake of fact justifying rescission:

> [T]he "fact" that Ms. Williams alleges the parties were mistaken about--that it would not be "impossible" for Ms. Williams to obtain financing because of her foreclosure--is not a fact at all. The Fannie Mae guidelines may make Ms. Williams ineligible for a conforming loan, i.e., one that can be purchased by Fannie Mae or Freddie Mac in the secondary market, but the guidelines have no effect whatsoever on whether Ms. Williams can obtain a non-conforming loan. The settlement agreement did not require that Ms. Williams get a conforming loan or in fact even contemplate at all where, how, or from whom Ms. Williams might obtain financing.

Opposition [Doc. # 90, filed 7/1/2010] at p. 3 (internal footnote omitted). According to M&T, "[a] non-conforming loan is a home mortgage that does not meet the criteria of Fannie Mae or Freddie Mac for various reasons including loan amount, loan characteristics or underwriting guidelines." Id. at p. 3 n.1

A settlement agreement is a contract between the parties. Citywide Bank of Denver v. Herman, 978 F. Supp. 966, 977 (D. Colo. 1997). The law favors compromise and settlement, and settlements will be enforced by the court. Id.; City and County of Denver v. Adolph Coors

7

Co., 813 F. Supp. 1476, 1479 (D. Colo. 1993). A trial court has the power, while a case is pending before it, summarily to enforce the settlement of the parties. United States v. Hardage, 982 F.2d 1491, 1496 (10th Cir. 1993).

The court must apply state contract law to issues involving the formation, construction, and enforcement of a settlement agreement. United States v. McCall, 235 F.3d 1211, 1215 (10th Cir. 2000). Under Colorado law, a settlement agreement does not have to be in writing to be enforced, Citywide Bank of Denver, 978 F. Supp. at 977 (applying Colorado law); DiFrancesco v. Particle Interconnect Corp., 39 P.3d 1243, 1248 (Colo. App. 2001), but its terms must be clear, unambiguous, and capable of enforcement. Adolph Coors, 813 F. Supp. at 1479. Normally, the construction of a contract is a question of law for the court. Florom v. Elliott Mfg., 867 F.2d 570, 575 (10th Cir. 1989). "Unless the words used by the parties to express their agreement are found to be ambiguous in some material respect, the court should give them legal effect according to their plain, ordinary and popular meaning." Id.

A party who knowingly and voluntarily authorizes the settlement of his claims cannot avoid the terms of the settlement simply because he has changed his mind. Woods v. Denver Dept. of Revenue, 45 F.3d 377, 378 (10th Cir. 1995). Nor can a contract be rescinded or avoided because one party made a unilateral mistake concerning a contract term. In re Marriage of Manzo, 659 P.2d 669, 672 (Colo. 1983). Rather, "[i]n order to avoid a contract on the ground of mistake, it must be a mutual mistake." Kuper v. Scroggins, 257 P.2d 412, 413-14 (Colo. 1953).

The plaintiff's assertion that the parties were mistaken about a Fannie Mae underwriting requirement at the time they entered into the settlement and that Ms. Williams cannot obtain a loan to perform the settlement terms because of that Fannie Mae requirement dictates a basic

8

review of what Fannie Mae is and does:

> Traditionally, mortgage loan originators, typically savings and loan associations, held the vast majority of loans they made in their portfolios until those loans were fully paid, often years after origination. This meant that lenders were committing substantial amounts of capital, for long periods of time, to each loan they made. When a borrower defaulted on her loan, the originating lender bore the cost of collection and any resulting loss. Consequently, lenders carefully scrutinized every borrower's ability to repay a proposed loan, requiring substantial equity (a down payment in the case of a purchase money loan--the most common kind of mortgage loan at the time), and lent on terms that could reasonably be expected to be affordable to the borrower in the long run. . . . [B]ecause lenders were investing their own capital, the number of loans they were able to make was constrained.
>
> \* \* \*
>
> Lenders [in the nineteenth century] did not have access to outside sources of financing and did not sell the loans they made; thus they lent entirely from their own capital. The number of loans that a lender could make was therefore limited by the funds actually held by that lender. . . . The pre-New Deal mortgage industry was characterized by simple funding mechanisms, severely limited lending capital, and generally ardent lender caution.
>
> The many Federal Government initiatives meant to stimulate stagnating industries during the Great Depression included efforts to shore up real estate sales and residential construction. Over the course of the Great Depression, more than half of all residential mortgage borrowers defaulted on their loans. This prompted a massive foreclosure stampede and subsequent devaluation of real estate, and consequently put an emphatic end to further mortgage lending. In order to recapitalize and reassure hard hit lenders, the Roosevelt administration purchased many of their non-performing loans. . . . The government quickly followed these purchases with the creation of the Federal Housing Administration ("FHA"), which insured privately-made mortgage loans that met FHA-established conditions and thus protected lenders from the risk of borrower defaults on such loans. . . . The most revolutionary development was the creation of the Federal National Mortgage Association (FNMA or "Fannie Mae"), which was charged with purchasing qualifying mortgage loans from lenders, thus freeing them to make more new loans. Instead of having their capital tied

9

>   up in mortgage loans for thirty years, lenders could quickly sell
>   qualifying loans to Fannie Mae, (and later to the Federal Home
>   Loan Mortgage Corporation--"Freddie Mac") and reuse that same
>   capital to make more loans. Lenders could thus make far more
>   mortgage loans than their capital would otherwise have allowed
>   without bearing the risk of borrower default on those loans.

David Vazire, Smoke and Mirrors: Predatory Lending and the Subprime Mortgage Loan Securitization Pyramid Scheme, 30 PACE L. REV. 41, 44-49 (2009).

      The FNMA ("Fannie Mae") was established in 1938, capitalized with $11 million of public funds, and purchased its first mortgages by May 5, 1938. Julie Anderson Hill, Bailouts and Credit Cycles: Fannie, Freddie, and the Farm Credit System, 2010 WIS. L. REV. 1 (2010) (at n. 137 and accompanying text).[1] Beginning in approximately 1970, Fannie Mae and Freddie Mac[2] began to "securitize" their mortgage loan holdings. Christopher L. Peterson, Predatory Structured Finance, 28 CARDOZO L. REV. 2185, 2198 (2007). In general:

>   Rather than holding mortgages themselves, . . . [t]he agencies
>   would purchase home mortgages, deposit large numbers of them in
>   "pools," and sell participations in the pools to investors on Wall
>   Street. With these new pass-through investment vehicles,
>   investors could hold a share of large (and diversified) numbers of
>   mortgages insured by the government in the case of Ginnie Mae,
>   or guaranteed by the large stable government sponsored enterprises
>   . . . in the case of Freddie Mac and Fannie Mae.

---

[1] The article is not paginated. Consequently, I cite to the footnote closest to the relevant text.

[2] In 1970, the Congress created the Federal Home Loan Mortgage Corporation, known as Freddie Mac. "The FHLMC, although authorized to purchase FHA and VA loans, focused primarily on conventional mortgages." Robin Paul Malloy, The Secondary Mortgage Market: A Catalyst for Change In Real Estates Transactions, 39 SW. L.J. 991, 994 (1986). A "conventional loan" is a loan which a lender primarily holds in its own portfolio. Id.

Id. at 2198-99.[3]

Fannie Mae established "strict underwriting guidelines that limit[ ] the kinds of mortgages eligible for insurance or purchase. . . ." Vazire, 2009 PACE L. REV. at 58. Among these underwriting limitations is the requirement that at least five years elapse after a foreclosure before a borrower may be eligible to qualify for a Fannie Mae underwritten loan. Ann. 08-16 [Doc. # 107-2].

Fannie Mae does not make mortgage loans. Instead, it is a large, government-sponsored enterprise that "guarantee[s] mortgage-backed securities and buy[s] home mortgages in the secondary market." Hill, 2010 WIS. L. REV. at n.5 and accompanying text. In 2008, Fannie Mae and Freddie Mac together "owned or guaranteed more than $5 trillion in residential mortgages-- more than 40 percent of the residential mortgage market." Id. at n.7 and accompanying text. Notably, however, approximately 60% of residential mortgages were not purchased by Fannie Mae or Freddie Mac.

This case is substantially similar to Hailpern v. Dryden, 389 P.2d 590 (Colo. 1964). In that case, the Drydens contracted to purchase a dry cleaning business from Hailpern. One element of the purchase agreement provided that Hailpern would assign to the Drydens his right to lease space in a proposed shopping center to be known as Sheridan Southwest Center. According to the Colorado Supreme Court, however:

> The evidence is undisputed that as of [the date of the Drydens' purchase] both the Drydens and Hailpern honestly believed that

---

[3]The Government National Mortgage Association (GNMA or "Ginnie Mae") "was a corporation established within the Department of Housing and Urban Development" and became "primarily responsible for the government's special assistance and housing support programs." Malloy, 39 SW. L.J. at 993.

> the shopping center was going to be constructed, though all knew
> that as of that time ground had not even been broken.

Id. at 592.

Eventually, when it became apparent that the Sheridan Southwest Center would not be constructed, the Drydens sought to rescind the contract based on an alleged mutual mistake of fact. The Colorado Supreme Court rejected the argument, stating:

> A mutual mistake of fact is a clear impression in the minds of the parties as to the existence of a material fact, sufficient in importance to influence and govern a mane of ordinary intelligence, and on which both parties relied and acted, *which fact did not exist*. To show mistake, the fact contrary to the belief of the parties must, not only be made to appear definitely, but must be shown to have existed at the time the parties had a different impression. *There can be no mutual mistake as to a fact to come into being in the future*.
>
> \* \* \*
>
> Applying these general principles to the facts of the instant case, we conclude that there simply was no mutual mistake as to any fact in existence as of the date of the contract, i.e. there was no "state of mind not in accord with the facts as such existed on [the date of the purchase]. The "mistake," if such it be, did not relate to an existing fact but only to a future contingency. We accept as true Robert Dryden's testimony that he would not have purchased the business but for his expectation that he could eventually relocate in a shopping center as then unbuilt. But this is no such mistake of fact as to justify the relief of rescission.

Id. at 235-36 (original emphasis).

In this case, the terms of the settlement were stated on the record. The terms are clear and unambiguous. There is no indication of any mutual mistake in connection with the settlement. In particular, the parties were not mutually mistaken about Ms. Williams' ability to qualify for a loan that met Fannie Mae's underwriting guidelines. To the contrary, there was no mutual agreement or understanding that Ms. Williams would obtain a Fannie Mae qualifying

loan. M&T's representative, who was present at the settlement conference and negotiated the terms of the settlement on behalf of M&T, testified at the hearing on the Motion to Rescind:

> Q: Did M&T understand that the agreement required any specific type of financing?
>
> A: No.
>
> Q: Did it understand it required any terms for financing?
>
> A: No
>
> Q: Did M&T understand that the agreement provided for Ms. Williams to get financing from any specific lender?
>
> A: No.
>
> Q: Did you understand--or did M&T understand that the agreement required Fannie Mae to underwrite this loan?
>
> A: No.
>
> Q: Or any other lender or--
>
> A: No.
>
> Q: --secondary agency? Did M&T have any understanding at the time of the agreement as to what Ms. Williams' plans were to obtain the financing?
>
> A: No.
>
> \*   \*   \*
>
> Q: . . . Did M&T have any understanding of what Ms. Williams' plans were at the time to obtain financing?
>
> A: No.
>
> Q: Okay. Did M&T know at the time of the agreement that Ms. Williams had a foreclosure on her record?
>
> A: Yes.
>
> Q: Did M&T understand at the time of the agreement that Ms.

13

> Williams may not be able to obtain financing?
>
> A: It was a possibility.
>
> Q: Did M&T understand that Ms. Williams may not be able to close on the property?
>
> A: There's a possibility.
>
> Q: And did M&T negotiate terms for the agreement based on the understanding she might not be able to close?
>
> A: Yes.

Hearing Transcript [Doc. # 108] at p. 31 line 6 through p. 32 line 21.

The fact that Ms. Williams cannot obtain a Fannie Mae qualifying loan does not mean that she cannot qualify for any loan. The evidence at the hearing established that there are lenders that make conventional or non-Fannie Mae qualifying loans. Id. at p. 39 line 25 through p. 41 line 4. There is no evidence that Ms. Williams cannot obtain third party financing from any source.

There was no mutual mistake of fact because there was no mutual understanding that Ms. Williams was to qualify for a Fannie Mae loan as the third party financing contemplated by the settlement. Kuper, 257 P.2d at 213 (holding that "[i]n order to avoid a contract on the ground of mistake, it must be a mutual mistake"). In addition, here as in Hailpern, the asserted mistaken fact was not a fact at all, but related to a mistaken contingency. "There can be no mutual mistake as to a fact to come into being in the future." Hailpern, 389 P.2d at 593. Ms. Williams has failed to show a mutual mistake of fact entitling her to rescind the settlement entered into by the parties.

The settlement agreement as stated on the record is clear and unambiguous. The evidence establishes that there was no mutual mistake of fact in connection with the terms of the agreement. Under these facts, there is no basis for the rescission of the settlement agreement as stated on the record on March 29, 2010, and April 22, 2010.

I respectfully RECOMMEND that the Motion to Rescind [Doc. # 86] be DENIED.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have 10 days after service of this recommendation to serve and file specific, written objections. A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed. R. Civ. P. 72(b); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. In re Key Energy Resources Inc., 230 F.3d 1197, 1199-1200 (10th Cir 2000). A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review. United States v. One Parcel of Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated October 5, 2010.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge